IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STRADLEY, RONON, STEVENS & YOUNG, LLP<br><br>Plaintiff,<br><br>v.<br><br>SOVEREIGN BANK, N.A.,<br><br>Defendant. | CIVIL ACTION<br>NO. 12-2466 |

# OPINION

**Slomsky, J.**                                                                                                                                                                    **January 15, 2013**

## I.    INTRODUCTION

Under pressure of a looming malpractice lawsuit from Defendant Sovereign Bank, N.A. ("Sovereign") for drafting a contract that allegedly did not fully protect Sovereign from financial losses caused by the bankruptcy of Taylor, Bean & Whitaker Mortgage Corporation ("TBW"), Plaintiff Stradley, Ronon, Stevens & Young, LLP ("Stradley"), a law firm, filed the instant action seeking relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02. This Act grants a district court the discretion to "declare the rights and other legal relations of any interested party seeking such declaration" upon the filing of a pleading seeking such relief. Id. § 2201(a). Stradley seeks here a declaration that the contract it drafted effectively protected Sovereign's financial interests and, in essence, that there is no basis for a malpractice lawsuit.

Sovereign has filed a Motion to Dismiss the Complaint, arguing that Stradley's purpose for filing the instant lawsuit was to circumvent a state court malpractice action. Sovereign argues that the Declaratory Judgment Act should not be used for this purpose. The Court agrees.

1

For reasons that follow, the Court will decline to entertain jurisdiction over this matter under the Declaratory Judgment Act.

**II.     FACTUAL BACKGROUND**

In order to fully understand what Stradley is attempting to achieve in this litigation, it is necessary to provide an extensive factual background.  In the mortgage industry, a "mortgagee" holds an interest in the mortgage note and has the right to foreclose on a property if the homeowner defaults on the mortgage.  When a homeowner defaults and the mortgagee begins foreclosure proceedings on the property, the obligation of the homeowner to pay certain expenses continues.  The expenses include, among other things, property taxes and insurance premiums. (Doc. No. 1 at 3.)  Mortgagees seek to recover the cost of these mandatory payments from the homeowner during foreclosure.  (Id.)  To ensure these payments are made, mortgagees contract with "mortgage servicers" who place advance funds into escrow accounts from which the expenses are paid.  (Id.)  These payments are known as "Servicer Advances."  (Id.)  After a mortgage servicer pays a Servicer Advance, the Servicer Advance becomes a debt owed to the mortgage servicer by the mortgagee.  (Id.)

TBW was a mortgage servicer.  (Id.)  TBW serviced mortgages for several mortgagees, including the following companies: FHLMC ("Freddie Mac"), GNMA ("Ginnie Mae"), Wells Fargo Bank, N.A. ("Wells Fargo"), and Bayview Loan Servicing LLC ("Bayview").  When TBW entered into a contract to service a mortgage, it was required to pay from its own funds any mortgage-related expenses as described above.  (Id.)  The mortgage companies were obligated to compensate TBW for Servicer Advances paid on their behalf.  (Id.)  The Servicer Advances owed to TBW by these mortgagees play a central role in the dispute between the parties here.

2

In order to pay Servicer Advances, TBW required access to large amounts of cash. (Id. at 4.) To meet this cash requirement, TBW borrowed funds through a revolving secured line of credit at Sovereign.[1] (Id. at 4.) Sovereign was a member of the group of banks funding the line of credit.[2] (Id.) The TBW line of credit was controlled by a contract titled the "Servicing Facility Loan and Security Agreement" ("the Agreement"). (Id.) The Agreement secured the line of credit with collateral to protect Sovereign in the event TBW filed for bankruptcy.[3]

The Agreement was amended several times over the life of the line of credit. In late 2007, Stradley began advising Sovereign on matters related to the Fourth Amended Agreement. (Id. at 6.) About that time, TBW owed approximately $300 million on the line of credit and, in turn, various mortgagees owed TBW approximately $300 million for the Servicer Advances made. (Id. at 5.) After the nationwide financial and credit crisis began in 2008, TBW struggled to make payments on the line of credit. (Id.) As a result, the Agreement with Sovereign was amended once again, resulting in the Fifth Amended Agreement. (Id.) The Fifth Amended Agreement restricted TBW's access to revolving credit by reducing the line of credit to $35 million. (Id.) The outstanding balance of $300 million owed to Sovereign by TBW was converted to a non-revolving loan. (Id.)

---

[1] Revolving credit means that the borrower can continuously use the line of credit to make purchases or pay debts, so long as the maximum amount of credit extended to the borrower is not exceeded. This differs from non-revolving credit, in which the credit available to the borrower does not "replenish" even if the debt is repaid. Because the borrower does not have the right to borrow funds at will, the lender's risk of lending to the borrower is reduced with a non-revolving loan.

[2] The other banks are not involved in this lawsuit.

[3] The security arrangement provided Sovereign with an interest in certain assets of TBW, which were identified as collateral in the Agreement. See infra. In the event of a default on the line of credit, Sovereign had the right to take possession of and liquidate the collateral in order to be compensated for the amount borrowed by TBW. TBW's right to collect Servicer Advances from mortgagees was the largest and most important component of the collateral.

Stradley was then asked by Sovereign to draft an amendment to the Fifth Amended Agreement. (Id.) A Sixth Amended Agreement was prepared and its terms are also central to this lawsuit. This Amended Agreement is the first and only version of the Agreement over which Stradley had actual drafting responsibilities. The changes made in the Sixth Amended Agreement focused on accelerated collection of the TBW line of credit. (Id.) Sovereign was named the "Agent" for the group of banks funding the TBW line of credit. (Id.) In addition, the Sixth Amended Agreement described the collateral as follows:

> Section 4.2    <u>Collateral</u>
>
> (a)    The Collateral shall consist of all right, title and interest of Borrower in, under and to each of the following, wherever located, whether now existing or hereafter arising, and whether now or hereafter owned or acquired by, or accruing or owing to, Borrower:
>
> (i)    All Servicing Contracts, all Servicing Rights, all other contracts, and all guaranties, instruments, documentation and chattel paper relating to or arising from such Servicing Rights and Servicing Contracts, and any other right, title and interest of Borrower in, to and under the Mortgage Notes, Mortgages and other security documents evidencing and securing the Mortgage Loans that are the subject of the Servicing Rights;
>
> . . . .
>
> (xii)    All now existing or hereafter arising accounts, chattel paper, general intangibles (including payment intangibles), instruments and software (as each such term is defined in Article 9 [of the Uniform Commercial Code]) constituting or relating to any of the foregoing Servicing Collateral;
>
> (xiii)    All claims and causes of actions in which Borrower has or may have against any Person, including but not limited to, tort claims and commercial tort claims, arising out of or relating to any of the foregoing, and the products and proceeds thereof; and
>
> (xiv)    All Products and Proceeds of the foregoing Servicing Collateral.

(Doc. No. 1–5 at 32.) Needless to say, this language was intended to grant to Sovereign a broad security interest in all rights held by TBW arising from the Servicer Advances in certain assets of the mortgagees.[4]

Another pertinent part of the Sixth Amended Agreement concerns what are known as "Approved Investors." In the "Definitions" section of the Sixth Amended Agreement "Approved Investors" are described as follows:

> "<u>Approved Investors</u>" shall mean FHLMC, GNMA or any other Person listed on <u>Schedule 3</u> for whom Borrower is servicing Mortgage Loans under a Servicing Contract. At the request of Borrower, Agent, in its sole discretion, may from time to time agree in writing to add Persons to the list set forth on <u>Schedule 3</u> and each Person approved by Agent shall be an Approved Investor as of the date of such approval (Agent's written approval must be given before any Servicing Contract may be entered into by Borrower with such Person). Following the addition of any Person as an Approved Investor hereunder, Agent shall provide notice thereof to Lenders by delivery to Lenders of a revised <u>Schedule 3</u>.

(<u>Id.</u> at 9 (emphasis in original).) Schedule 3 to the Sixth Amended Agreement reads as follows:

SCHEDULE 3

<u>Approved Investors</u>

FHLMC
GNMA

(Doc. No. 1–6 at 34.) No other text appears on the page. Schedule 3 was intended to be a list of mortgagees with whom TBW was servicing mortgage loans, and whose Servicer Advances would be subject to the terms of Section 4.2 as collateral for the line of credit.

Both Section 4.2 and Schedule 3 had been drafted by a law firm other than Stradley and were included in a prior version of the Agreement. Stradley made no changes to either provision in the Sixth Amended Agreement. (Doc. No. 1 at 6.) Before Sovereign executed the Sixth Amended Agreement, an attorney with Stradley, Kevin Masucci, emailed the draft of the Sixth

---

[4] In the "Definitions" section set forth in Article I of the Sixth Amended Agreement, "Servicing Collateral" is referred to as "the Collateral referred to in Section 4.2(a)." (Doc. No. 1–5 at 21.)

5

Amended Agreement to Sovereign, requesting comment and a confirmation that the contract was accurate. (Id. at 7; Doc. No. 1–7.) In response, Sovereign did not request that any changes be made to Schedule 3 of the Sixth Amended Agreement. (Doc. No. 1 at 8.) On May 15, 2009, the Sixth Amended Agreement was executed.

Thereafter, in the summer of 2009, federal investigators uncovered evidence that TBW was engaged in fraudulent activities. (Id.) TBW's Federal Housing Administration license was revoked, and officers and employees of TBW were later indicted for their role in criminal acts of fraud and falsification of mortgage data and financial statements. (Id.) On August 24, 2009, TBW filed for Chapter 11 bankruptcy in the U.S. Bankruptcy Court for the Middle District of Florida. (Id.)

During the bankruptcy proceeding, a committee of TBW's unsecured creditors asserted that Sovereign did not have a valid security interest in TBW's Servicer Advances with respect to any mortgagee other than Ginnie Mae and Freddie Mac, the only two entities listed on Schedule 3. (Id. at 9.) The unsecured creditors argued that the Sixth Amended Agreement did not capture Servicer Advances owed to TBW by other banks, such as Wells Fargo and Bayview, because they were not listed in Schedule 3. (Id.)

Sovereign blamed Stradley for this problem and requested that the law firm enter into a tolling agreement in order to protect against the running of a statute of limitations on a professional negligence or malpractice action. (Doc. No. 1–9.) On February 17, 2010, Paul A. Patterson, an attorney at Stradley, sent a letter to Bertin C. Emmons, Sovereign's Vice President and Senior Counsel. (Id.) The letter stated: "We have reviewed your request to enter into a Tolling Agreement with respect to the subject matter of your e-mail, and we are prepared to do so in order to avoid the need for Sovereign to potentially assert claims even though we firmly

6

believe no valid claims exist." (Id. at 2.) The letter also listed a series of suggested defenses that Sovereign and its outside counsel could assert to the claims of the unsecured creditors. (Id. at 2–4.) In sum, the letter noted that despite Wells Fargo and Bayview's absence from Schedule 3, the plain language of the Sixth Amended Agreement captured as secured collateral all Servicer Advances owed to TBW by Wells Fargo and Bayview, and that the arguments of the unsecured creditors were legally flawed. (Id.)

The unsecured creditors filed an adversary proceeding against Sovereign in the bankruptcy matter, seeking a declaratory judgment from the bankruptcy court that the Sixth Amended Agreement did not place liens on the Wells Fargo and Bayview collateral. On January 11, 2011, Sovereign filed an answer and counterclaim. (Doc. No. 1–10.) In its counterclaim, Sovereign took the position that the Sixth Amended Agreement gave TBW a valid security interest in the Wells Fargo and Bayview Servicer Advances owed to TBW. (Id.)

On October 3, 2011, William Slaughter, Sovereign's counsel in this matter, sent a letter to Lee Rosengard, an attorney at Stradley, explaining that Sovereign was in the process of settling with the unsecured creditors. (Doc. No. 1–11 at 2.) The letter stated:

> As you know, it is the Bank's view that had its security arrangement with TBW been properly documented by Stradley, the Bank would have been entitled to approximately $97 million in recoveries that TBW has received from Wells Fargo and Bayview, private investors who should have been listed as "Approved Investors" on Schedule 3 to the Sixth Amended and Restated Servicing Facility Loan and Security Agreement which Stradley prepared on the Bank's behalf. Should the settlement described herein be finalized, the Bank will seek to hold Stradley responsible for the losses the Bank has suffered as a result of Stradley's negligence.

(Id. at 3.) On October 11, 2011, Lee Rosengard replied to William Slaughter, "strenuously" objecting to the terms of the settlement and contending that Stradley's February 17, 2010 letter had laid out valid defenses to the unsecured creditor's claims. (Doc. No. 1–12.) The letter also asserted:

7

> [A]ny action by Sovereign Bank leading to a settlement on these terms is at its own risk. We will not stand accountable to Sovereign Bank for losses it sustains by reason of its acceptance of a settlement that fails to give due regard to all available defenses.
>
> [O]ur firm . . . believes that it discharged its obligations to Sovereign Bank in this engagement. After a careful and thorough review of our file, there is no basis, either based on the facts or the law, to assert that our firm was negligent in documenting the transaction in question. We will vigorously defend ourselves against any claims to the contrary.

(Id. at 3.)

Over the next two years, Sovereign and Stradley entered into tolling agreements and met from time to time in an attempt to resolve their dispute. (Doc. No. 4–2 at 2 n. 1.) On May 4, 2012, Stradley terminated the last tolling agreement and filed a Complaint seeking declaratory relief on the following claims: (1) the contract, as drafted, effectively protected Sovereign's right to the target collateral, and Stradley had satisfactorily performed its duties to Sovereign; (2) Sovereign is judicially estopped from arguing in any court that the contract was deficient because it took just the opposite position during the adversary proceeding before the bankruptcy court; and (3) to the extent the contract may have been deficient, Stradley was not responsible because Sovereign failed to provide updated information during the representation.[5] In the first line of the Complaint, Stradley highlights its ultimate aim in this case: "This is an action by Plaintiff,

---

[5] Stradley also seeks a declaration that will resolve a dispute between it and the trustee in bankruptcy regarding legal fees paid to Stradley by TBW. The trustee has commenced an adversary proceeding against Stradley in the bankruptcy case, alleging that $92,420.50 in legal fees paid by TBW to Stradley are a preferential transfer under the Bankruptcy Code. The trustee seeks to avoid the transfer for the benefit of TBW's creditors. Stradley contends that although the legal fees were paid by TBW, they were owed by Sovereign, and TBW paid the fees only after Sovereign sent the bill to TBW.

This dispute is outside the malpractice claim central to this case. The dispute over legal fees is between Stradley and the trustee in the adversary proceeding and need not be decided by this Court. Because the bankruptcy court is already familiar with the facts and legal issues in the adversary proceeding, there is no need for this Court to become involved in that dispute.

Stradley, Ronon, Stevens & Young, LLP . . . seeking to put an end to ongoing and baseless assertions and threats of malpractice being voiced by Defendant, Sovereign Bank, N.A. . . . ." (Doc. No. 1 at 1.)

On June 5, 2012, shortly after Stradley filed this action, Sovereign filed a malpractice lawsuit against Stradley in the Philadelphia Court of Common Pleas.[6] The next day, on June 6, 2012, Sovereign filed in the federal action the Motion to Dismiss the Complaint. (Doc. No. 4.) On June 26, 2012, Stradley filed a Response in Opposition to Dismissal. (Doc. No. 11.) On July 16, 2012, Sovereign filed a Reply Brief. (Doc. No. 13.) On September 24, 2012, the Court held a hearing on Sovereign's Motion. On October 3, 2012, Stradley's counsel wrote a letter informing the Court that the state court case had been stayed until the instant action is resolved. (Doc. No. 18.) The letter essentially reiterated Stradley's arguments at the September 24, 2012 hearing. On October 5, 2012, Sovereign's counsel responded to Stradley's letter. (Doc. No. 20.) The Motion to Dismiss is now ripe for disposition.

## III. ANALYSIS

### A. A District Court Has Discretion Under the Declaratory Judgment Act To Abstain From Deciding A Matter Involving State Law

The Declaratory Judgment Act empowers a district court to determine the rights or legal relations of parties involved in certain disputes. The Act provides:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201. "[D]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies

---

[6] The case is docketed as <u>Sovereign Bank, N.A. v. Stradley Stevens & Young, LLP</u>, June Term 2012, No. 0541 (Phila. Ct. Com. Pl.).

subject matter jurisdictional prerequisites." Wilton v. Seven Falls Co., 515 U.S. 277, 282 (1995). "Ordinarily it would be uneconomical as well as vexatious for a federal court to proceed in a declaratory judgment suit where another suit is pending in a state court presenting the same issues, not governed by federal law, between the same parties. Gratuitous interference with the orderly and comprehensive disposition of a state court litigation should be avoided." Brillhart v. Excess Ins. Co. of Am., 316 U.S. 491, 495 (1942).

In State Auto Insurance Cos. v. Summy, 234 F.3d 131 (3d Cir. 2000), the Third Circuit held:

> In order to maintain the proper relationship between federal and state courts, it is important that district courts "step back" and allow the state courts the opportunity to resolve unsettled state law matters. . . . When the state law is firmly established, there would seem to be even less reason for the parties to resort to the federal courts. Unusual circumstances may occasionally justify such action, but declaratory judgments in such cases should be rare.

Id. at 136. Moreover, where "there are no federal issues presented, state law controls, and the dispute can more efficiently and appropriately be resolved in the underlying state litigation, it is appropriate for this Court to abstain from exercising its jurisdiction." Hartford Cas. Ins. Co. v. Am. Recycling Sys., Inc., No. 09-3355, 2010 WL 3420046, at *4 (E.D. Pa. Aug. 25, 2010).

In deciding whether to abstain from exercising its jurisdiction, a district court must consider several factors. They are as follows: "(1) the likelihood that a federal court declaration will resolve the uncertainty of obligation which gave rise to the controversy; (2) the convenience of the parties; (3) the public interest in settlement of the uncertainty of obligation; and (4) the availability and relative convenience of other remedies." United States v. Pa. Dep't of Envtl. Res., 923 F.2d 1071, 1075 (3d Cir. 1991).

10

### B. The Court Will Decline To Exercise Jurisdiction Over This Case And Declare The Rights Of The Parties

#### 1. Stradley's Request For Relief Is A State Court Matter

The essence of this case is a malpractice dispute between a law firm and an aggrieved client. A claim of malpractice against a law firm involves a cause of action under state law. By filing the instant action, Stradley has attempted to preempt the ensuing state court proceeding against it for malpractice by suing first in federal court, rather than waiting to be sued in state court. In accordance with Brillhart, Summy, and Pennsylvania Department of Environmental Resources, see supra, this Court should not interfere with the pending state action, even though it was filed after the federal action. While Stradley requests a declaration, in effect, that it did not commit malpractice, the Declaratory Judgment Act should not be used to afford Stradley the relief it seeks here.

Sovereign has cited numerous cases to support its claim that the Declaratory Judgment Act should not be used to subvert the state action brought against Stradley. The precedent is persuasive. In Sun Oil Co. v. Transcontinental Gas Pipe Line Corp., 108 F. Supp. 280 (E.D. Pa. 1952), aff'd, 203 F.2d 957 (3d Cir. 1953), the Court asked the following questions: "may a declaratory judgment proceeding be used by a prospective defendant to forestall an imminent suit by a prospective plaintiff and to choose the forum in which the action shall be tried? May a tortfeasor change his role from defendant to plaintiff in order to select the court in which to have his liability determined?" Id. at 282. Courts have held that a declaratory judgment proceeding may not be used in such a manner, stating: "it is not one of the purposes of the declaratory judgment act[] to enable a prospective negligence action defendant to obtain a declaration of non-liability." Id.; see Crown Cork & Seal Co. v. Borden, Inc., 779 F. Supp. 33, 35 n.1 (E.D. Pa. 1991); see also Cunningham Bros. v. Bail, 407 F.2d 1165 (7th Cir. 1969).

In <u>Friedman v. Geller</u>, 925 F. Supp. 611 (E.D. Wis. 1996), the court held that an attorney could not bring a declaratory judgment action to determine non-liability for malpractice, holding:

> A declaratory judgment action is not a tool to compel potential negligent plaintiffs to litigate their claims at a time and in a forum chosen by the alleged tortfeasors. <u>Cunningham Bros.</u>, 407 F.2d at 1167. It is inappropriate to use the declaratory judgment statute in what would otherwise be a run-of-the-mill negligence action. Malpractice presents no special issues, and the only court to reach the issue ruled that an action for a declaration of nonliability of malpractice was an inappropriate use of a declaratory judgment statute.

<u>Friedman</u>, 925 F. Supp. at 613. In <u>Friedman</u>, the court also described the purpose of the Declaratory Judgment Act:

> Declaratory judgment actions prevent a party from using the threat of a suit to create a Hobson's choice for an adversary. . . . In a patent dispute, for example, the party holding the patent may threaten to sue someone (the accused party) for producing a product that infringes on the patent. As long as the patentee waits to sue, however, the accused party must either stop producing its product and sacrifice its market position or continu[e] selling the product, with each sale increasing its potential liability to the patentee.

<u>Friedman</u>, 925 F. Supp. at 613.

Here, there is no such Hobson's choice, as the accused party, Stradley, no longer represents Sovereign. The law firm's potential liability stems from its alleged past conduct in negligently drafting the Sixth Amended Agreement. There is no uncertainty as to its future responsibility to Sovereign. Moreover, the dispute between Sovereign and Stradley is nothing more than an ordinary professional negligence case arising from former services provided by the law firm, and the damages, if there are any, are calculable. The claim involves a matter arising under state law, and Stradley may defend itself in state court. Therefore, declaratory judgment is not appropriate here, as the justiciable controversy properly lies in the state court malpractice action.[7]

---

[7] Stradley argues that because it filed the instant action before Sovereign filed its malpractice action in state court, the cases cited by Sovereign are distinguishable. The Court disagrees. As

2. Viewing This Case As One Involving Contract Interpretation Does Not Change The Analysis

Stradley attempts to frame this case as one involving contract interpretation only, rather than the tort of malpractice, citing numerous cases in which courts have exercised authority under the Declaratory Judgment Act in contract disputes. See, e.g., Krajewski v. Am. Honda Fin. Corp., 557 F. Supp. 2d 596, 611–12 (E.D. Pa. 2008). However, Stradley's claim that this case involves a matter of contract interpretation only and not a tort is unpersuasive.

First and most importantly, in none of the cases cited was a declaratory judgment sought by a plaintiff who is not a party to the contract. Stradley is not a party to the Sixth Amended Agreement, which is an agreement between Sovereign (and the rest of the bank group) and TBW.

---

Sovereign points out in its Reply Memorandum, in both Sun Oil Co. and Crown Cork & Seal Co., this court dismissed declaratory judgment actions filed by putative defendants even though those actions were filed first. The fact that Stradley filed this case before Sovereign filed suit in the Philadelphia Court of Common Pleas is irrelevant, and Stradley has not cited any case law stating otherwise.

The Court also notes that the Sixth Amended Agreement is controlled by Florida law. The reasoning in Summy, supra, was based, in part, on the notion that a "state's interest in resolving its own law must not be given short shrift simply because a party or, indeed, both parties, perceive some advantage in the federal forum." Summy, 234 F.3d at 136. The question of whether Summy ought to control when a state court must apply the law of another state has been addressed recently in this District.

In First Mercury Insurance Co. v. Legends, Inc., No. 12-1536, 2012 WL 6634363 (E.D. Pa. Dec. 19, 2012), the court held that application of another state's law was not a reason to distinguish Summy. Id. at *4. The court reasoned that:

> State and federal courts being equally competent to apply out-of-state law, [Summy's] application neither bears on the critical inquiry of "whether the dispute can better be settled in the proceeding pending in the state court," nor eclipses the "considerations of practicality and wise judicial administration" that the Supreme Court has instructed are a touchstone for proper exercise of jurisdiction in declaratory judgment actions, and that the Third Circuit expounded upon in Summy.

Id. at *4 (quoting Summy, 243 F.3d at 133, 136) (alteration and internal citations omitted). The Court agrees with the reasoning of First Mercury Insurance Co. and Summy as applied to this action. A Pennsylvania court can just as easily apply Florida law as this Court can apply it.

13

Stradley has not cited a single case where a court has interpreted a contract through the Declaratory Judgment Act in favor of a non-party to the contract, especially a case where a law firm's only connection to the contract was drafting it. The effect of a declaration from this Court that the Sixth Amended Agreement captured all of Sovereign's target collateral would merely provide Stradley with a defense against malpractice because it is not a party to the contract with the disputed terms. No case has held that a law firm may preclude a state law claim of professional negligence through the use of the Declaratory Judgment Act in federal court.

Second, in pursuing the argument that this case only involves a question of contract interpretation, Stradley asks the Court to declare that the Sixth Amended Agreement as drafted by its attorneys properly captured Wells Fargo and Bayview Servicer Advances as collateral. If this Court so found, Stradley would then argue that Sovereign prematurely settled with the unsecured creditors because the contract was properly drafted. Such a matter is incidental to the underlying issue of malpractice, which is for a fact-finder to decide in state court.

In Crown Cork & Seal Co., 779 F. Supp. 33 (E.D. Pa. 1991), the court was presented with an argument similar to the one made here by Stradley — that the case merely involves a contract dispute. In that case, a seller manufactured and sold aerosol cans to a buyer. Id. at 34. Seller filled the cans with paint and sold them. Id. After some cans leaked, buyer sought reimbursement from seller for the costs of recall. Id. For years, the parties tried to resolve their dispute, but to no avail. Id. Eventually, buyer issued an ultimatum that if seller did not reimburse buyer for its losses due to the defective cans, buyer would file suit. Id. Instead, seller sued first by filing a preemptive declaratory judgment action in federal court, seeking declarations that, among other things, the cans were not defective, and seller did not breach the contract. Id.

The court declined to exercise jurisdiction over the case, holding that the strategy of filing a declaratory judgment action in order to preemptively choose a forum "has already been considered and rejected by other district courts." Id. at 35 (citing Bd. of Regents for Nw. Mo. State Univ. v. MSE Corp., No. 90-0125, 1990 WL 212098 (W.D. Mo. Nov. 20, 1990)). The plaintiff seller in Crown Cork & Seal Co. argued that the court should entertain jurisdiction because seller requested the court to interpret a contract with the defendant buyer, rather than declare the liability of a tortfeasor. However, the court was not persuaded by that argument, noting:

> [Plaintiff] claims its suit is different because it sounds in contract, not tort. . . . Yet even conceding that a personal injury plaintiff may, in some instances, have a more compelling need to choose the forum than a contract litigant, I do not think [defendant's] interest in choosing the forum here is so much smaller that [plaintiff] should be able to manipulate it with declaratory judgment acts.

Crown Cork & Seal Co., 779 F. Supp. at 35 n.1 (citing Cunningham Bros. v. Bail, 407 F.2d 1165 (7th Cir. 1969)).

Similarly, in Cunningham Bros., the Seventh Circuit rejected an argument that "an action by a potential tort defendant against the potential plaintiffs should fall within the purpose of the Declaratory Judgment Act." 407 F.2d at 1167. Additionally, the court held that "couching the suit in terms of contract rather than tort does not change the nature of the action," and affirmed the district court's dismissal of the case. Id. at 1168.

Shifting the focus of this case away from malpractice to a contract does not persuade the Court that Stradley has properly requested relief under the Declaratory Judgment Act. The Complaint is rife with statements that contradict an assertion that this case was filed for the purpose of interpreting a contract. For instance, the first line of the Complaint reads: "This is an action by Plaintiff, Stradley, Ronon, Stevens & Young, LLP . . . seeking to put an end to ongoing and baseless assertions and threats of malpractice being voiced by Defendant, Sovereign Bank,

15

N.A. . . . ." (Doc. No. 1 at 1.) This attention-grabbing opening sentence makes no mention of a contract, and is instead concerned with malpractice.

Similarly, the final paragraph in the factual background section of the Complaint states: "Sovereign Bank's threat of a suit against Stradley is nothing more than an attempt to shift blame away from its own mistakes and failings as Co-Agent and then Agent of the TBW Loan . . . ." (Id. at 16.) Throughout the Complaint are attempts to deflect the blame away from Stradley onto Sovereign. Any defense Stradley has in the malpractice action, including the interpretation of the Sixth Amended Agreement, is a matter to be decided in the state court action.

   3.  Judicial Estoppel Does Not Create A Justiciable Controversy For This Court To Resolve

Stradley places great emphasis on the doctrine of judicial estoppel as a means to create a federal nexus to support the use of the Declaratory Judgment Act. Stradley argues that Sovereign is judicially estopped from asserting that the Sixth Amended Agreement does not capture the targeted collateral because it took a contrary position while litigating the adversary proceeding in the bankruptcy court. During the adversary proceeding, Sovereign filed papers with the bankruptcy court arguing that the Sixth Amended Agreement gave Sovereign a valid security interest in the Wells Fargo and Bayview Servicer Advances. Stradley contends that Sovereign now takes the opposite position, which is necessary to prosecute the claim of malpractice against Stradley. Stradley argues that the integrity of the federal judiciary will be undermined if a party is allowed to take a position that is inconsistent with a position taken before a different federal court — in this case, the Bankruptcy Court for the Middle District of Florida. The reliance upon judicial estoppel is not persuasive.

"[T]hree factors inform a federal court's decision whether to apply [judicial estoppel]: there must be (1) 'irreconcilably inconsistent positions;' (2) 'adopted . . . in bad faith;' and (3) 'a

showing that . . . estoppel . . . addresses the harm and . . . no lesser sanction is sufficient.'" G-I Holdings, Inc. v. Reliance Ins. Co., 586 F.3d 247, 262 (3d Cir. 2009) (quoting Chao v. Roy's Constr., Inc., 517 F.3d 180, 186 n. 5 (3d Cir.2008)) (alterations omitted).  The Third Circuit has "endorsed the view that judicial estoppel is an extreme remedy, to be used only when the inconsistent positions are tantamount to a knowing misrepresentation to or even fraud on the court." Chao, 517 F.3d at 186 n. 5 (quoting Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp., 337 F.3d 314, 324; Total Petroleum, Inc. v. Davis, 822 F.2d 734, 738 n. 6 (8th Cir.1987)) (quotation marks omitted).

Stradley argues that the Court should be concerned with protecting the federal judiciary from Sovereign's allegedly inconsistent positions.  The Court is not convinced that Sovereign has engaged in conduct so egregious that it is "tantamount to a knowing misrepresentation to or even fraud on the court." Id.

First, Sovereign settled with the unsecured creditors, and therefore the bankruptcy court did not rule on Sovereign's claims in the adversary proceeding.  "[I]t does not constitute bad faith to assert contrary positions in different proceedings when the initial claim was never accepted or adopted by a court or agency." Montrose Med. Grp. Participating Sav. Plan v. Bulger, 243 F.3d 773, 782 (3d Cir. 2001).  "In order to invoke judicial estoppel, a party must show that the opponent took a contrary position in a prior proceeding and that the prior position was accepted by the court. . . . 'Judicial estoppel does not bar a party from contradicting itself, but from contradicting a court's determination that was based on that party's position.'" Resolution Trust Corp. v. Farmer, 823 F. Supp. 302, 314 (E.D. Pa. 1993) (quoting Teledyne Indus., Inc. v. N.L.R.B., 911 F.2d 1214, 1218 (6th Cir. 1990)) (alteration and emphasis omitted).

17

Thus, because the bankruptcy court made no determination on Sovereign's claims, judicial estoppel is not implicated here.

Second, the position taken by Sovereign in the bankruptcy court is simply another defense available to Stradley in the malpractice action in state court. The state court can rule on the claim of judicial estoppel as it sees fit. For all these reasons, there is no need for this Court to invoke the extreme remedy of judicial estoppel.

### C.   Additional Factors Warranting Dismissal

Finally, the Court has considered the four factors set forth by the Third Circuit in Pennsylvania Department of Environmental Resources, 923 F.2d 1071 (3d Cir. 1991), see supra, in determining whether to retain jurisdiction over this matter.

    1.    The Likelihood That A Federal Court Declaration Will Resolve The Uncertainty Of The Obligation Which Gave Rise To The Controversy

A declaration from this Court on the issues requested by Stradley would not necessarily resolve the uncertainty of Stradley's obligations to Sovereign. Because Stradley is not a party to the Sixth Amended Agreement, interpreting the contract would merely establish a defense to malpractice or, if the Court ruled in Sovereign's favor, establish the possibility that Stradley committed malpractice. However, the issue of malpractice, which is the underlying legal dispute between the parties, would not be resolved in its totality, and additional litigation might be required. Even if a declaration from this Court would resolve the parties' obligations, "this factor, by itself, is insufficient to warrant exercising jurisdiction in this case." Allstate Ins. Co. v. Antoine, No. 11-5850, 2012 WL 707069, at *3 (E.D. Pa. Mar. 6, 2012) (citing Hartford Cas. Ins. Co. v. Am. Recycling Sys., Inc., No. 09-3355, 2010 WL 3420046, at *3 (E.D. Pa. Aug. 25, 2010)).

### 2. The Convenience Of The Parties And The Availability And Relative Convenience Of Other Remedies

These two factors weigh in favor of declining jurisdiction over this matter. Sovereign wishes to proceed against Stradley in the Philadelphia Court of Common Pleas in its malpractice action. Stradley's principal place of business is in Philadelphia, so that court is a convenient forum for both parties. Additionally, as stated supra, the dispute between these parties centers on the question of whether Stradley committed malpractice in drafting the Sixth Amended Agreement. The Philadelphia Court of Common Pleas is capable of providing a remedy to Sovereign if the court determines Sovereign was harmed by the alleged malpractice, and Stradley may assert any defenses to that claim in a forum that is no less convenient than this Court.

### 3. The Public Interest In Settlement Of The Uncertainty Of The Obligation

This factor weighs in favor of declining jurisdiction as well. The public interest would be better served if this Court did not interfere in the state court proceeding and decide state law issues of malpractice. Allstate Ins. Co., 2012 WL 707069, at *5 ("the public interest would be better served by allowing the state court to decide an issue of state law"). Resolving the case in state court would remove any uncertainty as to the liability of Stradley.

## IV. CONCLUSION

Sovereign's Motion to Dismiss the Complaint will be granted.

An appropriate Order follows.